SUPERIOR COURT OF NEW JERSEY
                         ATLANTIC COUNTY/CRIMINAL DIVISION
                         INDICTMENT NO. 13-07-1875
                         APPEAL NO.


. . . . . . . . . . . . . . . . . . . . . . . . .

STATE OF NEW JERSEY        :
                                   STENOGRAPHIC TRANSCRIPT
          v.               :          OF BAIL HEARING

MICHAEL CASTRO,            :

          Defendant.   :

. . . . . . . . . . . . . . . . . . . . . . . . .

                         PLACE:   Atlantic County Courthouse
                                  4997 Unami Boulevard
                                  Mays Landing, NJ 08330

                         DATE:    September 19, 2013

B E F O R E:

    HONORABLE BERNARD E. DeLURY, JR.

TRANSCRIPT ORDERED BY:

    OFFICE OF COUNTY COUNSEL, CAMDEN COUNTY

A P P E A R A N C E S:

    JOHN V. MAHER, ASSISTANT PROSECUTOR
    (ATLANTIC COUNTY PROSECUTOR'S OFFICE)
    Attorney for the State

    DOUGLAS L. CODY, ESQUIRE
    (CODY LAW FIRM)
    Attorney for the Defendant

          *          *          *          *          *


                         ADELE TALASNIK, CCR
                         OFFICIAL COURT REPORTER
                         CRIMINAL COURT COMPLEX
                         4997 UNAMI BOULEVARD
                         MAYS LANDING, N.J. 08330

1              THE COURT:  All right.  Let's call State v.

2   Michael Castro, Indictment 13-07-1875 for status

3   conference and motions.  Counsel, may I have your

4   appearance please?

5              MR. MAHER:  Good morning, Judge, John Maher

6   on behalf of the State.

7              MR. CODY:  Good morning, your Honor.  Douglas

8   Cody from Cody Law Firm, Hammonton, New Jersey, on

9   behalf of the defendant Michael Castro.

10             THE COURT:  Thank you, counselors.  Let me

11  summarize our chambers conference and then we'll

12  proceed.  In chambers we did discuss the status of

13  discovery.  I reviewed with counsel Mr. Cody's

14  correspondence on the subject together with Mr. Maher's

15  memoranda that indicated the steps that he has taken so

16  far in order to bring discovery up-to-date.  There is

17  ongoing State's investigation in order to secure

18  responses to many of Mr. Cody's requests, and my

19  thinking is to give it an additional four-week

20  adjournment for discovery purposes so that Mr. Maher

21  can complete his supplemental and then provide them as

22  appropriate.  Once Mr. Cody has received that, I would

23  then ask the parties to agree a short list of matters

24  still in disagreement for submission to the court for

25  my determination and then I would just call it on the

1   papers at that point, gentlemen, if there is anything

2   of substance left after the State has completed its

3   investigation on the issue of discovery.  I also

4   understand that there may be further trial preparation

5   discovery that will present itself once Mr. Maher

6   completes his interviews with people who may or may not

7   be associated with the case, and then providing those

8   supplementals to Mr. Cody may require additional time

9   for defense investigation which of course the court

10  will entertain.  Mr. Cody has also informed the court

11  that there may be motions for the court to consider.

12  First would be a motion to dismiss the indictment.

13  Once the discovery is complete, he'll be in a position

14  to evaluate the probity of such a motion, and then a

15  motion to suppress any statements made allegedly by the

16  defendant to the police in the course of investigation.

17  And at our next status conference I'll get the parties

18  a scheduling order for those motions.  I believe that

19  correctly summarizes our discussion in chambers.

20  Anything to add, State?

21              MR. MAHER:  Nothing, Judge.

22              THE COURT:  Anything to add, defense?

23              MR. CODY:  No, your Honor.

24              THE COURT:  Thank you.  And then I also

25  believe Mr. Cody has an application on the subject of

1   bail.  I have it here in front of me.  I'll be happy to

2   hear you, sir.

3           MR. CODY:  Thank you, your Honor.  We're

4   asking the court to grant an order reducing the amount

5   of bail posted for release to $275,000 or less.

6   Obviously with the option to post bail by a surety bond

7   or bail bond.  We look at 3:26-1 under State v.

8   Johnson, the factors thereunder, Mr. Castro has a

9   residence available to him in New Jersey through his

10  stepfather Mr. Wallowitz (phonetic) who submitted an

11  affidavit along with the bail brief, that he's a

12  retired Chief Master Sergeant in the air force, has

13  known Mr. Castro his entire life.  He's capable of

14  providing not only residence, but employment.

15          Mr. Castro has no prior criminal conviction.

16  He was in the area of New Jersey, in fact, within

17  several miles of his previous home for a period of

18  about eight months after the alleged homicide in this

19  case and returned home to Florida after that eight-

20  month period.  He was arrested some 14 months after

21  this homicide and he was -- he waived extradition back

22  here to New Jersey at his first opportunity.  The

23  affidavits and certifications that were submitted

24  provide evidence of the very strong family support

25  structure.  He has a daughter that obviously he's very

1   close with, you have certifications from his mother,

2   his stepfather and his fiancee.  They are responsible

3   members for the community vouching for his reliability.

4   And, in addition, this is a case where there is not a

5   likelihood of conviction which would compel a greater

6   bail amount.

7           As we discussed all of the evidence that's

8   presented in the State's responsive brief and

9   affidavit, it is essentially circumstantial, there's no

10  confession or admission by the defendant in this case

11  or eyewitness testimony.  There's no forensic evidence

12  or scientific evidence connecting the defendant to the

13  scene weapon nor to the weapon.  The State does not

14  possess a murder weapon, and virtually all the

15  circumstantial evidence that is listed by the

16  prosecution in its response brief is either

17  contradicted by other evidence or lacks sufficient

18  credibility to give the Court an indication that

19  there's a likelihood of conviction in this case.  And

20  obviously we're not here to try the case at a bail

21  hearing, but that's a factor under Johnson the Court

22  should consider.  There's nothing particular about this

23  case that would indicate that the bail should be set so

24  high the defendant has no reasonable chance of securing

25  his release, and unless the amount which is set is set

1    in such a way that it is bondable, there's no practical

2    way the defendant would be able to be released prior to

3    his trial in this matter.

4             And finally, I believe that the State cites

5    the incorrect bail schedule in this matter.  My

6    understanding is that the defendant is essentially at

7    maximum under the bail schedules that are operative now

8    at $1,100,000 and we'd ask that that amount be reduced

9    to $275,000 or less.

10            THE COURT:  Mr. Cody, thank you for your

11   argument.  State.

12            MR. MAHER:  Judge, with respect to the bail

13   guidelines, I have checked.  We have been operating

14   under the guidelines that were, I guess, distributed by

15   Judge Donio and indicate after July of 2012, the bail

16   guidelines were amended to increase the amounts of all

17   bails but including murder.  And I actually called the

18   Administrative Office of the Courts and they indicated

19   that that's still in the proposal stage.  I believe

20   we've been operating on it for about a year-and-a-half,

21   all the judges, in considering bail, but the current

22   guidelines are actually those that were submitted or

23   promulgated on May 12, 2009.  So as an officer of the

24   Court, I am going to advise the Court that I do believe

25   that the maximum, and these are only guidelines, Judge,

1    the bail with guidelines now for homicide,

2    notwithstanding what was sent out by the AOC and given

3    to everybody, are still between 250 and a million.

4              Now, Judge, with respect to the facts of this

5    case, I did submit a brief where I outlined in detail

6    the facts of the case. We did discuss them in

7    chambers, but I submit, Judge, that the case, although

8    circumstantial against Mr. Castro, is strong. I submit

9    that the fact that he waived extradition should really

10   have no bearing because, as your Honor knows,

11   extradition is basically a formality. If you fight

12   extradition, all you're going to do is just increase

13   the amount of time before you get brought back to New

14   Jersey and face the charges that you've been charged

15   with, so I don't believe that should have any weight.

16             My brief indicates that Mr. Castro does in

17   fact have prior arrests, but no convictions. He was

18   arrested in Georgia in 2005 and 2006, in Texas in 2005,

19   and he was prosecuted under the Universal Code of

20   Military Justice in 2004. The reason I bring these

21   things up is because they do show involvement with the

22   criminal justice system, but, more importantly, they

23   show involvement with the system other than in the

24   jurisdiction of New Jersey. He also, as I indicated in

25   my brief, from looking at his driver abstract, has

1    several failures to appear in traffic court.  I know

2    they're not serious, but they do at least show evidence

3    of ignoring judicial process, albeit for minor traffic

4    offenses, but they do indicate what they indicate.  The

5    family -- I have read Mr. Cody's brief -- there are

6    family members who submit affidavits basically saying

7    that Mr. Castro is basically a good guy, he could never

8    have committed a murder.  That's not evidence.  Judge,

9    I submit that in many cases family members will feel

10   that way.  They do indicate that they will keep an eye

11   on him if he is released.  Well, that's a question for,

12   I guess, in all cases.  We have to evaluate what we're

13   looking at here and determine whether or not the

14   defendant is in fact a flight risk, and based on the

15   facts of the case, Judge, I believe the likelihood of

16   conviction is strong.

17          We did go into the facts in chambers and they

18   are included in my brief, and there were certain things

19   that in our discussion that came up that I think I

20   should refer to.  It's true that the defendant was not

21   charged by way of complaint until April of 2013, and

22   that was a significant period of time after the

23   homicide in this case, but it's important to note that

24   in this particular case Megan Bailey, who is the

25   defendant's fiancee, was not interviewed and a sworn

1    tape recorded statement taken from her until March 22,

2    2013, and at that point in time, because what she told

3    the police differed so markedly from what Mr. Castro

4    had told the police on his whereabouts on the day of

5    the homicide, it was decided that that was basically

6    the linchpin, the last piece of evidence that the State

7    felt was necessary in order to charge in this

8    particular case.  The case basically indicates that

9    Mr. Castro was suffering -- was in financial distress.

10   We believe that we do have evidence to indicate that in

11   the affidavit that was supplied with my brief, among

12   other things, we have information that Mr. Castro had

13   submitted checks to Glenn Kingsbury in his business

14   that had bounced totaling about $8,000, that he had

15   purchased gym equipment in the amount of $12,000 that

16   had never been paid for, and at the time of this

17   incident, this murder, the business account of the

18   business that Mr. Castro operated had just a few

19   dollars in it, less than maybe $11 or $12.  So on the

20   date in question, there was numerous text messages and

21   phone calls between Mr. Castro and members of the

22   Kingsbury household that basically, in our opinion,

23   were in an attempt to find out if anybody was still in

24   the house, we believe that Mr. Castro having been an

25   employee of -- Judge, I think I'm kind of wandering

1    around here, but I did submit all of these facts in my

2    affidavit, I don't want to go over everything because,

3    as Mr. Cody indicated, it's not a mini-trial, but the

4    facts show that Glenn Kingsbury ran a business where

5    large amounts of cash were basically brought back from

6    various cheer competitions on weekends.  That cash

7    would be in the premises that Mr. Castro had been to

8    many times because he worked for the Kingsbury Cheer

9    business, he knew that the cash was there.

10            On the date in question, on the date of the

11   homicide, there were numerous telephonic and text

12   messages between Mr. Castro and Mr. Glenn Kingsbury's

13   girlfriend, Karen Drew, as opposed to just two voice

14   calls that were noted in our discussion earlier being

15   at 11:17 and 11:09 a.m., there were also text messages

16   between Mr. Castro and Miss Drew at 11:22 a.m., 11:38

17   a.m., 11:40 a.m., 11:59 a.m., 12:28 p.m., 2:19 p.m. and

18   again at 2:19 p.m., so those messages actually were

19   within the time frame of the homicide, and the cell

20   site information that was referred to earlier as being

21   consistent with Mr. Castro being in the area of the

22   homicide at the time of the homicide, I submit, is

23   borne out by the record that the State has at this

24   point in time.

25            As your Honor is aware, I note from the

1    State's brief that the weapon that was used to commit

2    the homicide in this particular case was never

3    recovered, but the weapon that was used has been

4    identified because Mr. Castro's business partner, one

5    Lauren Cole, possessed a weapon, and that weapon has

6    never been recovered, but when she was on vacation in

7    Florida, when she came home from vacation, after the

8    homicide in this case, she discovered that that weapon

9    had been taken.  There was no evidence in her house,

10   according to her, of any kind of burglary or forcible

11   entry, but that gun in fact was gone.  A search warrant

12   was performed and the box that that gun was sold in was

13   recovered and there was a spent test shell casing in

14   that box.  That shell casing was sent to the state

15   police lab and compared to the shell casings that were

16   found on the scene, it was determined that the same gun

17   would have to have been Lauren Cole's, that's her name,

18   that was Mr. Castro's business partner, had to be her

19   gun that had in fact killed John Kingsbury.  So because

20   of the fact that the only person that we're aware of

21   who had access to Lauren Cole's house by way of key was

22   Mr. Castro, and in fact we have text messages

23   indicating he in fact was in her house picking up

24   checks for the business that they ran in Hammonton at

25   or around the time of the homicide leads us to believe

1    that he was the only person who had access to the

2    weapon that was used to kill Mr. Kingsbury.  He had

3    motive, and we have evidence that he was in the area of

4    the murder at the time of the murder.  In addition to

5    that, there was also his car which is a metallic blue

6    Kia, witnesses -- and it's in the affidavit of Sergeant

7    Mattioli that's attached to my moving papers --

8    witnesses in the area, and I will state that the area

9    is a rural area that does not have much traffic through

10   it, and witnesses in that area who take notice

11   apparently of everything that goes on in that area

12   identified a car by way of a color as being metallic

13   blue which is similar to Mr. Castro's car, and I submit

14   that it's not the type of car that is commonplace.

15          So, Judge, that's basically the State's case;

16   it's a case of circumstantial evidence.  We don't have

17   any witnesses that Mr. Castro in fact committed this

18   homicide, but I submit that we have strong

19   circumstantial proofs to show that he had motive,

20   opportunity to do it, and I think, Judge, under all the

21   circumstances, that the bail is appropriate as set.

22          THE COURT:  Thank you, counselors.  Chris,

23   would you just check the bail screen for me and let me

24   know what the status is.

25          THE CLERK:  $1,100,000.

```
 1              THE COURT:  And any conditions set by the

 2   Court previously on the bail?

 3              MR. MAHER:  Judge, if I may, I have the

 4   original copies of the complaints if you want me to

 5   show -- if you want us to approach.  Judge Baker did

 6   set one million on the bail, and then on a separate

 7   complaint charging weapons offenses, he set an

 8   additional hundred thousand dollars, which is little

 9   out of the ordinary.

10              THE COURT:  I want to see if it had been

11   blanketed or anything else.  So it's one million on the

12   one warrant and a hundred thousand on the other.

13              This is a bail review regarding Michael

14   Castro being held in default of total bail of

15   $1,100,000 on complaints now subsumed by Indictment

16   13-07-1875.  The Court has considered the briefs

17   submitted by both sides and the arguments of counsel

18   here today, and in reviewing the Johnson factors I

19   conclude as follows:  This is a serious offense, most

20   serious obviously in our code as a crime of the

21   first-degree murder.  Upon conviction, the presumption

22   of imprisonment does apply, the minimum sentence is 30

23   do 30, maximum is life.  That balance is in favor of

24   the State that it would be a sentence that the

25   defendant would seek to avoid if he could.  On the
```

1    likelihood of conviction or extent of punishment, I've

2    discussed that likelihood of conviction in this case.

3    Without performing a mini-trial that both sides have

4    said they don't want to do today, nor do I, it does

5    appear to be a circumstantial case and there are

6    certainly arguments and circumstances on both sides

7    that would abide trial rather than bail review, that

8    factor is in equipoise.

9            The criminal record of this defendant, he has

10   no serious record.  He has no criminal record.  He has

11   minor non-judicial punishment in his past.  When

12   associated with the military, has some failures to

13   appear with respect to minor traffic offenses.  His

14   reputation in the community appears to be good.  I

15   reviewed all the submitted letters in support from

16   family members and friends, and those weigh in his

17   favor.  He does have ties to the local community as

18   evidenced by that.  I do take note of the fact,

19   however, that he does have significant ties out of

20   state in the State of Florida where he was found and

21   returned here on a warrant.  Does appear to have a

22   record of employment, otherwise appears to be a

23   responsible member of the community.  I've considered

24   the bail schedules as well.  Mr. Maher is correct, the

25   bail guidelines that have been distributed by the Court

1    are still in proposed status.  I have been using the

2    '09 schedules myself, and the high end of the bail

3    range for murder is $1,000,000, starts at $250,000

4    rather than the $3,000,000 range which is suggested by

5    the proposed guidelines.  I will adjust bail because it

6    is outside of the current guidelines, and in view of

7    the fact that this defendant does not have a prior

8    criminal record and the case does appear to be

9    circumstantial.  However, a substantial bail is

10   required in order to ensure his presence for further

11   proceedings.  Bail will be adjusted to $800,000.  GPS

12   monitoring is required.  Work, worship, medical, court

13   appearances, not to leave the state or Atlantic County

14   without court permission.  No contact with any victim

15   survivors or witnesses in the case except through

16   counsel.  Set the matter down for a further status

17   conference on I can either give you October 21st or the

18   23rd, counselors.  How do your calendars look?

19           MR. MAHER:  I'm fine with either one, Judge.

20           MR. CODY:  Judge, October 23rd, I think,

21   would be good.

22           THE COURT:  Set it down for October 23rd.  No

23   other changes to the bond condition and make it

24   blanket.  It's on the indictment now, so it doesn't

25   have to be.  Okay.

1              MR. CODY:   Judge, may I require is that cash

2     only or is that bond?

3              THE COURT:   It's bondable, cash or bond.   I

4     saw it was full cash, it didn't say cash only on the

5     original warrants, I believe, but every judge seems to

6     use a different phrase, no 10 percent, okay.   All

7     right, thank you, counselors.

8              MR. CODY:   Thank you, your Honor.

9              MR. MAHER:   Appreciate it.

10             (At this time the matter was concluded)

11                      * * * * * * * * * *

12

13                         CERTIFICATION

14

15     I, ADELE TALASNIK, C.S.R., License Number X101087, an

16     Official Court Reporter in and for the State of New

17     Jersey, do hereby certify the foregoing to be prepared

18     in full compliance with the current Transcript Format

19     for Judicial Proceedings and is a true and accurate

20     non-compressed transcript to the best of my knowledge

21     and ability.

22

23     _____   _____
       Official Court Reporter         Date    1/14/14
24     Atlantic County Courthouse

25