[Doc. No. 6]

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| GLENN KINGSBURY,<br><br>      Plaintiff,<br><br>  v.<br><br>CAMDEN COUNTY SHERIFF'S<br>DEPARTMENT, et al.,<br><br>      Defendants. | Civil No. 13-7912 (NLH/JS) |

MEMORANDUM OPINION AND ORDER

This matter is before the Court on the "Motion for an Order Declaring that Tort Claims Notices Have Been Timely Filed or, in the Alternative for Leave to File Late Notices of Tort Claims" ("Brief") [Doc. No. 6] filed by plaintiff Glenn Kingsbury. Plaintiff requests the Court to find that his Notice of Tort Claim ("Notice of Claim" or "Notice") forwarded to defendants Lauren Kohl, Camden County, and the Camden County Sheriff's Department on October 28, 2013 was timely filed pursuant to N.J.S.A. § 59:8-8 of the New Jersey Tort Claims Act ("NJTCA") (N.J. Stat. Ann. § 59:1-1 et seq.). Plaintiff argues that his claims against these parties did not accrue until he first learned at defendant Michael Castro's ("Castro") September 11, 2013 criminal hearing that the weapon used to kill his father belonged to defendants' employee, Lauren Kohl. The Court

1

received the opposition of defendants Camden County and Camden County Sheriff's Department ("Opposition") [Doc. No. 11], and plaintiff's reply [Doc. No. 13].[1] The Court recently held oral argument. For the reasons to be discussed, plaintiff's motion is DENIED.

Background

The present action arises out of the death of plaintiff's father, John Kingsbury, who was shot and killed on February 5, 2012, during an apparent home invasion at plaintiff's residence in Mullica Township, New Jersey. Br. at 1. Plaintiff was the first person to discover his father's body and found two spent .380 caliber shell casings located nearby. Affidavit of Michael Mattioli at 4 [Doc. No. 11-1]. An autopsy confirmed that plaintiff's father died as a result of two gunshot wounds to the head. Id. On the night of the shooting, the Atlantic County Prosecutor's Office ("ACPO") opened a homicide investigation and interviewed plaintiff and his girlfriend, Karen Drew ("Drew"). Id. While discussing possible suspects, plaintiff informed the ACPO that he owned a cheerleading event coordinating business with Drew, which generated a large amount of cash that was often

---

[1] At oral argument defense counsel clarified that defendants Camden County and the Camden County Sheriff's Department are a single legal entity. Transcript of Oral Argument, July 3, 2014 ("Tr.") 7:23-25, 8:1-4. As such, the Court shall hereinafter collectively refer to defendants Camden County and the Camden County Sheriff's Department as "defendant."

kept in his home. Id. at 5. Plaintiff explained that he had "dozens of employees [and] business associates (including [defendant] Michael Castro ("Castro")) that [were] aware of the volume of cash his business generates." Id. Plaintiff told the ACPO that he also owned and operated a gymnastics business out of a facility he rented with Castro, who operated a separate martial arts gym in the same facility. Id. Plaintiff stated that he knew Castro for less than a year at the time of the shooting, but noted that Castro occasionally worked for his company. Id.

In her interviews with the ACPO, Drew voiced her suspicions of Castro's involvement in the death of plaintiff's father, noting that Castro owed plaintiff several months of back rent and "bounced" multiple checks totaling approximately $8,000. Id. Drew's suspicions were largely predicated upon numerous calls and text messages she received from Castro questioning her about her plans to leave plaintiff's home on the day of the shooting. Id. 6-7. In Drew's opinion, "Castro texted her several times for . . . no real reason other than to find out if she had left the house." Id. at 7. In subsequent interviews with the ACPO, Drew mentioned that Kohl, an officer with the Camden County Sheriff's Department, served as the accountant for Castro's martial arts business. Drew claimed that she and plaintiff witnessed Kohl secure a handgun behind the front desk at plaintiff's gymnastics facility, but did not specify when this allegedly occurred. Id.

3

at 9. Drew also explained that in the days following the shooting, plaintiff contacted Castro about the back rent he owed and was told that Kohl was "straightening it all out." Id. According to Drew, she sent multiple text messages to Kohl inquiring about the status of the back rent. Kohl eventually responded to Drew's messages on February 9, 2012, stating that her partnership with Castro had been dissolved and instructed Drew to contact Castro about the money owed. Id.

On February 19, 2012, Kohl contacted the Winslow Township Police Department to report that two of her weapons were missing from her home. When Kohl was questioned by the police about the whereabouts of her guns, she recalled last seeing the guns in her home on December 24, 2011. Although Kohl alleged that she first noticed the guns were missing on February 13, 2012, she did not file a police report until six days later.

After a year passed without any arrests, despite Castro emerging as a primary suspect, plaintiff decided to hire a private investigator to investigate his father's murder. Pl.'s Aff. at ¶¶ 6-7. Soon thereafter, on April 9, 2013, plaintiff claims he learned that Castro was arrested in Florida and charged with his father's homicide. Pl.'s Aff. at ¶ 8. According to plaintiff, it was not until Castro's pre-trial hearing on September 11, 2013, that he learned the handgun Castro allegedly

4

used to kill his father "had been in the custody and/or control of . . . Lauren Kohl." Id. at ¶ 10.

On October 28, 2013, plaintiff forwarded a Notice of Claim directed to Kohl, Camden County, and the Camden County Sheriff's Department. See Br., Ex. A. Camden County responded by letter dated October 30, 2013, notifying plaintiff it would "not acknowledge receipt of [plaintiff's] claim since it was received by the County outside of the ninety (90) days permitted under the [NJTCA]." Br., Ex. C [Doc. No. 6-3].

Notwithstanding Camden County's letter, plaintiff filed the instant action on December 31, 2013, acting as executor of his father's estate. Complaint [Doc. No. 1]. Plaintiff asserts the following claims against Castro, Kohl, Camden County, and the Camden County Sheriff's Department: (1) violation of New Jersey's Civil Rights Act, N.J.S.A. § 10:6-1; (2) negligence; (3) wrongful death; and (4) survivorship. See generally Compl. In addition, plaintiff asserts a claim pursuant to 42 U.S.C. § 1983 against all defendants except Castro. Id. In relevant part, plaintiff alleges that his father's death was directly and proximately caused by defendant's alleged failure to adequately train and supervise Kohl on the "proper and lawful use, storage, and handling of firearms." Compl. at ¶ 27.[2]

---

[2] Since filing his complaint and the present motion, plaintiff has adjusted his theory of liability with respect to

5

Plaintiff filed the present motion on January 29, 2014, requesting the Court to find that his Notice of Claim was timely filed under N.J.S.A. § 59:8-8. Br. at 3. Plaintiff relies on the "discovery rule" in arguing that his cause of action against defendant did not accrue until September 11, 2013, when he discovered he had potential civil claims arising out of a link between Kohl's weapon and his father's murder. Id. at 5-6. Accordingly, plaintiff argues his Notice of Claim was properly filed within ninety days of the accrual date of his cause of action. In the alternative, plaintiff requests the Court to grant him leave to file a late Notice of Tort Claim under N.J.S.A. § 59:8-9 and asserts that "extraordinary circumstances" exist to warrant such relief. Id. at 6.

In opposition, defendant represents that the gun allegedly used by Castro was not Kohl's service weapon, nor was it issued to her by defendant. Opp'n at 3. Defendant relies on the Affidavit of Sergeant Kevin Cunane of the Camden County Sheriff's Office of Internal Affairs, who confirmed that the handgun used to kill plaintiff's father was never issued to Kohl by the Camden County Sheriff's Office. Affidavit of Kevin

---

defendant. Plaintiff no longer asserts that the weapon used to kill his father was Kohl's service weapon issued by defendant. However, plaintiff maintains that his claim against defendant arises out of its alleged failure to "train [its] employee [Kohl] how to safely keep not only her service weapon, but all weapons . . . in a gun locker." Tr. 23:1-4.

6

Cunane, ¶¶ 6-7 [Doc. No. 11-3]. Defendant argues plaintiff's Notice of Claim is untimely because his cause of action accrued on February 5, 2012, the date plaintiff's father was shot and killed. Defendant posits that "plaintiff had all the information he needed and, if not, had ample opportunity to make whatever investigation deemed necessary to confirm that [Kohl], a public employee may have been involved in the death of [plaintiff's father] as far back as the date the crime was committed." Opp'n at 8. In sum and substance, defendant argues the discovery rule is inapplicable to plaintiff's claims due to plaintiff's failure to diligently pursue the "known connections" between Castro and Kohl and "follow up on [his] long simmering suspicions." Id. at 11.

As will be discussed, plaintiff's motion is denied. The Court concludes plaintiff failed to file a timely Notice of Claim pursuant to the NJTCA.  The Court also declines to apply the discovery rule to plaintiff's claims, finding that plaintiff's cause of action accrued on February 5, 2012, the date his father was killed.

Discussion

Under the NJTCA, "[n]o action shall be brought against a public entity or public employee . . . unless the claim upon which it is based shall have been presented in accordance with the procedure set forth in this Chapter." N.J.S.A. § 59:8-3.

7

The purpose of the NJTCA is to "reestablish the immunity of public entities while coherently ameliorating the harsh results of the [sovereign immunity] doctrine." Tripo v. Robert Wood Johnson Med. Ctr., 845 F. Supp. 2d 621, 626 (D.N.J. 2012) (quoting Beauchamp v. Amedio, 751 A.2d 1047, 1049 (N.J. 2000)). The NJTCA requires the party seeking to file a claim against a public entity to serve a Notice of Claim on the public entity within ninety days of the accrual of the cause of action. See N.J.S.A. § 59:8-8(a). Generally, a failure to meet the deadline for service of notice results in the claimant being "forever barred from recovering against [the] public entity." N.J.S.A. § 59:8-8. However, the statute provides courts with limited discretion to allow the late filing of a Notice of Claim. Under N.J.S.A. § 59:8-9, the Court may allow the late filing of notice if the party makes its motion within one year of the claim accrual date provided: "(1) the claimant seeking to file a late claim shows reasons constituting 'extraordinary circumstances' for the claimant's failure to meet the 90-day filing requirement; and (2) that the defendant(s) are not 'substantially prejudiced thereby.'" Tripo, 845 F. Supp. 2d at 627 (citing N.J.S.A. § 59:8-9).

   The Court must engage in a "sequential analysis" to determine whether plaintiff's Notice was timely filed.

Beauchamp, 751 A.2d at 1051. The New Jersey Supreme Court has explained:

> The first task is always to determine when the claim accrued. The discovery rule is part and parcel of such an inquiry because it can toll the date of accrual. Once the date of accrual is ascertained, the next task is to determine whether a notice of claim was filed within ninety days. If not, the third task is to decide whether extraordinary circumstances exist justifying a late notice. Although occasionally the facts of a case may cut across those issues, they are entirely distinct.

McDade v. Siazon, 32 A.3d 1122, 1129 (N.J. 2011) (quoting Beauchamp, 751 A.2d at 1051).

It is well settled that "[t]he accrual date under the [NJTCA] is generally the date of the accident or date on which the alleged tort is committed." Davis v. Twp. of Paulsboro, 371 F. Supp. 2d 611, 618 (D.N.J. 2005) (citing Beauchamp, 751 A.2d at 1050). Nonetheless, "[i]n limited situations the accrual date may differ from the date of the initial negligent act or omission." Davis, 371 F. Supp. 2d at 618 (noting that survival causes of action accrue on the date of the initial injury).

Courts have held that the "discovery rule" can be applied in the NJTCA context where "the victim is either not aware of the injury or, regardless of awareness of the injury, does not know that some third party is responsible for the injury." Tripo, 845 F. Supp. 2d at 628; Davis, 371 F. Supp. 2d at 618; Beauchamp, 751 A.2d 1047. "Under the 'discovery rule,' the

9

statute of limitations does not begin to run until the injured party becomes aware, or should become aware, of the existence of his or her injury, or that injury is due to the fault of a previously unidentifiable individual or entity." Tripo, 845 F. Supp. 2d at 628 (citation omitted). In other words, "the discovery rule will not toll the date of accrual simply because a claimant does not know the actual identity of the tortfeasor." Id. at 630 n. 4. The discovery rule "applies only where the injured party has no reason to know of the existence of a claim." Id. at 628 (citation omitted).

The New Jersey Supreme Court has explained that the test for applying the discovery rule is "whether the facts presented would alert a reasonable person, exercising ordinary diligence, that he or she was injured due to the fault of another." McDade v. Siazon, 32 A.3d 1122, 1129 (N.J. 2011) (quoting Caravaggio v. D'Agostini, 765 A.2d 182 (N.J. 2001)). "Once a person knows or has reason to know of this information, his or her claim has accrued since, at that point, he or she is actually or constructively aware of that state of facts which may equate in law with a cause of action." Abboud v. Viscomi, 543 A.2d 29, 32 (N.J. 1988) (citation and quotation omitted); O'Neill v. City of Newark, 701 A.2d 717, 722 (N.J. Super. Ct. App. Div. 1997) (finding "no hint of a legislative intent that the time to give

10

notice should be extended until the party discovers a public entity is involved.").

The Court must first determine the date plaintiff's cause of action accrued. As will be discussed, the Court finds the accrual date is February 5, 2012, the date plaintiff's father was killed. The New Jersey Supreme Court's ruling in McDade is instructive on this issue. 32 A.3d 1122 (N.J. 2011). In McDade, the injured plaintiff tripped over a raised sewer pipe protruding from a sidewalk. Id. at 1126. The plaintiffs, intending to assert personal injury claims against the owner of the sewer pipe, served a Notice of Claim on a number of public entities that did not own the pipe. Id. at 1125. The plaintiffs failed to conduct an investigation to discover the pipe's actual owner, and were not informed of the true owner's identity until seven months after the claim accrued. Id. Rather than obtaining the court's permission to file a motion for leave to file a late Notice of Claim, the plaintiffs served an untimely "amended" Notice upon the public entity that owned the pipe. The plaintiffs subsequently filed their complaint seventeen months later naming as defendants the county, the public entity that owned the pipe, the homeowners of the property adjacent to the sidewalk where the accident occurred, and fictitious defendants. Id. at 1127.

11

The trial court denied the defendant public entity's motion for summary judgment, invoking the discovery rule to find that the plaintiffs' claims did not accrue until they were advised that the right public entity owned the pipe. Id. at 1125. The Appellate Division subsequently reversed the trial court's denial of the public entity's summary judgment motion and remanded for the entry of an order dismissing the plaintiffs' claims against the public entity. Id. at 1127.

The New Jersey Supreme Court granted certiorari to address the issue of "whether a plaintiff who has failed to serve a timely notice of claim pursuant to N.J.S.A. 59:8-8, and has failed to file a motion for leave to file a later notice in accordance with N.J.S.A. 59:8-9, can pursue a claim against a public entity." Id. at 1125. The court found that on the date of the accident, the injured plaintiff was aware that he "had been injured by the pipe, and that the owner of the pipe was potentially liable for that injury". Id. at 1131. The court explained that in failing to search public records or physically inspect the pipe to determine its owner's identity, the plaintiffs "did not act with the reasonable diligence required by the discovery rule." Id. In affirming the lower court's holding, the Court reasoned that "[g]iven plaintiffs' awareness of the injury, and their knowledge that the entity responsible for the pipe was a potential tortfeasor, the discovery rule

12

[did] not toll the date of accrual of plaintiffs' cause of action." Id. at 1132.

This case is similar to McDade in that plaintiff was aware that his father was shot and killed and that the owner of the gun was a potential tortfeasor. Nevertheless, plaintiff did not exercise reasonable diligence within ninety days of his father's death to discover the identity of the owner of the subject gun. For example, plaintiff waited a year to hire a private investigator. Plaintiff also did not seek public records regarding the gun. Defendant represents that a records request would have disclosed the February 21, 2012 Winslow Township Police Department Investigative Report where Kohl reported two handguns missing or stolen, including the gun later identified as the murder weapon. Brief at 11. In addition, plaintiff did not present evidence that he asked any prosecutor for information or records relating to Kohl's guns. Plaintiff's failure to use reasonable diligence dooms his motion. Plaintiff's late notice is not saved by the discovery rule.

In another relevant case, Murphy v. Cty. of Ocean, the plaintiff sustained an injury after his motorcycle struck a pothole in the roadway. Civ. No. L-1143-11 (per curiam), 2012 WL 3021087 (N.J. Super. Ct. App. Div. July 3, 2012). Within two months of the accident, the plaintiff served a Notice of Claim on the township in which the accident occurred. After being

13

notified four months thereafter that the defendant county, not the township, owned and controlled the roadway at issue, the plaintiff served a Notice of Claim against the defendant county and filed a complaint against same. In response to the defendant's motion to dismiss, the plaintiff cross-moved for leave to file a late Notice of Claim. The trial court granted the plaintiff's motion finding that the township "obscured" the identity of the proper party in its initial response to the plaintiff's notice by requesting additional information and waiting four months to advise him it did not maintain the road. The trial court concluded that the plaintiff could reasonably infer that the town was the proper party. Id.

On appeal, the Appellate Division reversed the trial court's decision and remanded for the entry of an order dismissing the plaintiff's complaint against the defendant county. Id. at *4. In so holding, the court found that the township's failure to disclose that the defendant county was responsible for the road did not "thwart" the plaintiff's effort. The court added that the "record [was] bereft of any, much less diligent, efforts made by [the] plaintiff in identifying the public entity responsible for the maintenance of the roadway at the site of the accident." Id. at *3.

Similar to the plaintiffs in McDade and Murphy, the Court finds that plaintiff failed to take reasonably diligent efforts

14

to identify defendant as a potentially responsible party. Given plaintiff's awareness of the cause of death, and his knowledge that the owner of the gun at issue was a potential tortfeasor, the discovery rule does not toll the accrual date of plaintiff's cause of action. See McDade, 32 A.3d at 1132. Plaintiff concedes that he suspected Castro's involvement from the outset of his investigation. See Tr. 13:5-11. The record shows plaintiff was acquainted with both Castro and Kohl at the time of his father's death. Plaintiff was aware that Castro and Kohl were partners in a martial arts business operated out of plaintiff's facility, knew Kohl and Castro socialized, and believed Castro "house-sat" for Kohl on a number of occasions. Pl.'s Aff. at ¶ 11. Plaintiff knew or should have known that Kohl was an officer with the Camden County Sheriff's Department, and that Kohl had access to a handgun that Castro knew about. Moreover, plaintiff was aware of Castro's financial problems, that his girlfriend was immediately suspicious of Castro, and that Castro sent his girlfriend suspicious calls and texts right before his father died. Plaintiff also knew or should have known Castro knew plaintiff kept large sums of cash in his home. Given all of this knowledge and readily available information, especially Castro's connection to and relationship with Kohl, and the fact that they had access to a gun, plaintiff had reason to know of Kohl's alleged involvement in his father's murder. Even if plaintiff

15

did not know of Kohl's involvement, he had reason to know. If plaintiff had exercised reasonable diligence he would have learned of Kohl's involvement with the gun at issue and served a timely Notice. As already noted, plaintiff's failure to exercise reasonable diligence dooms his motion. The Court agrees with defendants' argument: "[r]easonable diligence required an investigation . . . that went beyond a mere reading of the police report before the discovery rule may be invoked." Brief at 1 (citing Iaconianni v. N.J. Turnpike Auth., 236 N.J. Super. 294, 298 (App. Div. 1989), cert. den. 121 N.J. 592 (1990)).

In light of the information available to plaintiff in the ninety days following his father's death, the Court does not accept plaintiff's argument that "[h]e had no reason to suspect . . . that the murder weapon came from any other source [and] certainly no reason to suspect that the murder weapon came from [Kohl]." Tr. 13:20-23. According to defendant, plaintiff would have found out that Kohl reported that her guns were stolen had he made an Open Public Records Act request with Camden County. Id. at 33:7-10. This was not done. Further, there is no evidence that plaintiff even inquired through available channels whether Kohl was the registered owner of any guns. Importantly, plaintiff did not have to know for a certainty about Kohl's role before he served a Notice. If, as the Court finds, plaintiff should have known about Kohl's potential involvement by the

16

exercise of "reasonable diligence and intelligence," plaintiff was required to timely serve his Notice. Lopez v. Swyer, 300 A.2d 563, 565 (N.J. 1973); see also Beauchamp, 751 A.2d at 1052 ("A person need not have or even contemplate filing a claim in order to trigger the notice provision.  It is more properly denominated as a notice of injury or loss."). The discovery rule does not apply under these circumstances.

   As already discussed, important information linking Kohl to the murder weapon was available or could have been available to plaintiff had he exercised reasonable diligence to investigate the relationship between Kohl and Castro and the ownership of the gun at issue. While plaintiff was aware of "tests" being conducted by a crime lab, there is nothing in the record to indicate that plaintiff, or his investigator, sought information about the identity of the weapon's owner. Tr. 16:13-17; Pl.'s Aff. at ¶ 6. The Court is not persuaded that plaintiff's hiring of a private investigator a year after his father's death constituted the "reasonable diligence required by the discovery rule." McDade, 32 A.3d at 1131. As defendant points out, plaintiff offers no evidence to support his claim that the "private investigator's activities appear to have been a catalyst in the arrest of Michael Castro." See Br. at 7. Without any record of the private investigator's purported fruitful "activities", the Court is left to speculate whether plaintiff

17

made sufficient efforts to discover the identity of the subject gun's owner. Further, plaintiff did not explain why he waited so long to hire a private investigator.

Plaintiff's reliance on Servis v. State is not persuasive. 511 A.2d 1299 (N.J. Super. Ct. Law Div. 1986). In Servis, after nearly a year of uncertainty regarding the cause of her husband's death, the plaintiff received medical reports indicating that her husband died as the direct result of a tick bite sustained at the county jail. Id. at 1300. The plaintiff subsequently filed a motion for leave to file a Notice of Claim against the State of New Jersey on behalf of herself and her child. Id. The court held that the plaintiff's Notice of Claim was timely filed after applying the discovery rule and concluded that "[t]he cause of the injuries and eventual death of [the plaintiff's husband] were unknown and unascertainable until the medical reports were made available" nearly a year after the decedent died. Id. at 1301.

Unlike the plaintiff in Servis who did not learn the cause of her husband's death until nearly a year after his passing, the connection between Kohl's gun and the decedent's death was ascertainable within ninety days of the accrual date (February 5, 2012) of plaintiff's claims against defendant. Plaintiff knew as early as February 5, 2012, that his father died as a result of gunshot wounds. Pl.'s Aff. at ¶ 4. Plaintiff not only had

18

actual knowledge of the cause of his father's death, but he also maintained a suspicion of who killed him, i.e., Castro. And, plaintiff knew about Kohl's relationship to Castro and the fact they had access to guns. As discussed, plaintiff had sufficient information and ample opportunity to investigate individuals closely associated with Castro. Such reasonable efforts and affirmative steps to investigate would have likely yielded the discovery of Kohl's link to the weapon at issue within the ninety day statutory window. Given this situation, the Court finds that plaintiff did not engage in sufficient inquiries into the owner of the murder weapon. Therefore, the Court declines to apply the discovery rule and finds that plaintiff's cause of action accrued on February 5, 2012, the date of the alleged homicide. Given the accrual date of February 5, 2012, plaintiff's Notice of Claim is untimely since it was served well past the requisite ninety day period under N.J.S.A. § 59:8-8. As noted in Tripo, supra, 845 F. Supp. 2d at 628, the discovery rule only applies if plaintiff had no reason to know of a claim against defendant. For the reasons already discussed in detail, the Court finds this is not the case.

In light of the Court's ruling that plaintiff's cause of action accrued on February 5, 2012, plaintiff's request for leave to file a late Notice of Claim under N.J.S.A. § 59:8-9 is denied. Plaintiff argues that extraordinary circumstances are

present to warrant such relief. It is well settled that "[o]nce the one-year outer time limit has passed, a court cannot allow late notice, and thus cannot consider extraordinary circumstances or potential prejudice." Davis, 371 F. Supp. 2d at 618 (citing Sinclair v. Dunagan, 905 F. Supp. 208, 213 (D.N.J. 1995)); see also Iaconianni v. N.J. Tpk. Auth., 565 A.2d 1084, 1086 (N.J. Super. Ct. App. Div. 1989) (holding that where "the late notice of claim was filed well beyond the one-year outer limit, the trial court [has] no jurisdiction to extend the filing period"). The present motion, filed on January 29, 2014, far exceeds the one year limitation on the Court's authority to grant the requested relief. Therefore, plaintiff's motion for leave to file a late Notice of Claim is denied.

Conclusion

Accordingly, and for all the foregoing reasons,

IT IS HEREBY ORDERED this 2nd day of September, 2014, that plaintiff's "Motion for an Order Declaring that Tort Claims Notices Have Been Timely Filed or, in the Alternative for Leave to File Late Notices of Tort Claims" is DENIED.[3]

>                                 /s/ Joel Schneider
>                                 JOEL SCHNEIDER
>                                 United States Magistrate Judge

---

[3] The Court expresses no opinion on the viability of plaintiff's theory of liability that defendant was under a duty to train its officers how to handle and store their personal weapons, and to keep them in a gun safe, so that the weapons would not be taken to murder someone.